**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 2 2 2011 ★

BROOKLYN OFFICE

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
Jonathan Horne (JH 7258)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MARGIE GOLDBERG, MAURICE HANAN, AND
RENEE SALAM HANAN, INDIVIDUALLY AND
ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

        Plaintiffs,

        vs.

GEROVA FINANCIAL GROUP, LTD.;
STILLWATER CAPITAL PARTNERS, LLC;
STILLWATER CAPITAL PARTNERS, INC.;  NET
FIVE HOLDINGS, LLC; GARY T. HIRST,
MICHAEL HLAVSA; JACK DOUECK;
CHRISTOPHER HOLMES; ANDREW TSE; LOU
HENSLEY; ARIE JAN VAN ROON; STUART L.
R. SOLOMONS; TORE NAG; KEITH LASLOP;
RICHARD RUDY; AND ROBERT WILLISON,

        Defendants.
------------------------------------------------------------X

**CV 11 - 1385**

CASE No.:

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

AMON, J.

J. ORENSTEIN, M.J.

        Plaintiffs Margie Goldberg, Maurice Hanan, and Renée Salam Hanan, individually and on

behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint

against Defendants, allege the following based upon personal knowledge as to themselves and their

own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation

1

conducted by and through their attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Gerova Financial Group, Ltd. ("Gerova" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a class action on behalf of a class consisting of all persons who were investors in the Stillwater Funds (defined below) other than Defendants who acquired the common stock of Gerova pursuant to a share exchange agreement dated December 23, 2009, and that was completed on January 20, 2010 (the "Share Exchange").

2.  Defendants are Stillwater Capital Partners, Inc., Stillwater Capital Partners, LLC, (collectively "Stillwater"), Gerova and certain of its current and former officers and directors. Also named as defendants is Net Five Holdings, LLC, a joint venture to which Gerova contributed all of its real estate assets following the Share Exchange, and Robert Willison one of its operating members.

3.  Plaintiffs are limited liability investors in various private partnerships and limited liability companies managed by Stillwater that invested in real estate and related assets such as asset backed loans.

4.     Gerova, formerly known as Asia Special Situation Acquisition Corp., was a special purpose acquisition company, also known as a blank check company, formed for the specific purpose of finding an Asian related business to acquire.

5.     Gerova is listed on the New York Stock Exchange.  Currently all trading in its shares is suspended due to Defendants' failure to provide accurate and timely information to investors.

6.     It could find no Asian business to acquire, so it arranged to refund the vast majority of its cash to investors and use the remaining public shell to acquire the investment funds managed by Stillwater and Weston Capital Management, LLC ("Weston").

7.     As a result, Gerova proposed to undertake a transaction that simultaneously would utilize the Gerova public shell to acquire and combine: (1) the investment funds and/or assets managed by Stillwater, (2) the investment funds and/or assets managed by Weston, (3) Northstar Group Holdings, Ltd. an insurance company, and (4) an 81.5% interest in Amalphis Group, Inc., a reinsurance business secretly owned and controlled by Gerova insiders (the transaction is referred to herein as the "Business Combination").

8.     The relative value assigned to each of the companies in the Business Combination is as follows:

3

|  | Value Assigned in Business Comination | % of Total Value |
|---|---|---|
| Stillwater Funds * | $ 650,000,000 | 76.5% |
| Weston Funds | $ 106,000,000 | 12.5% |
| Amalphis Group, including Allied Provident | $ 87,000,000 | 10.2% |
| Northstar Group Holdings | $ 7,000,000 | 0.8% |
| Total assets combined | $ 850,000,000 | 100.0% |

\* Subject to Adjustment after audit

Post adjustment total for Stillwater Funds
is estimated to be $500,000,000 and 70.6%

9.      The declared business purpose of the Business Combination was to use the illiquid

assets of the Stillwater and Weston investment funds as regulatory capital to enable the expansion of

the insurance businesses of Amalphis and Northstar.

10.     On December 23, 2009, Defendants disseminated to Stillwater Funds' investors a

Consent Solicitation describing the terms of the Business Combination that would result in the

transfer of all of the Stillwater Funds' and/or their assets to Gerova in exchange for investors receipt

of Gerova series A preferred stock that shortly would convert into publicly registered and freely

tradable Gerova common stock.

11.     The Consent Solicitation was jointly drafted by the officers, directors and partners of

Stillwater, including Jack Doueck, Richard Rudy, and Stillwater, (the "Stillwater Defendants") and

the officers and directors of Gerova.

12.     The December 23, 2009 Consent Solicitation gave Stillwater investors one week -

until January 1, 2010- to evaluate and return their votes for the Business Combination with Gerova.

4

13.     The Consent Solicitation stated that the Share Exchange and Business Combination were in the best interests of the Stillwater Funds and recommended Stillwater investors vote yes.

14.     The Consent Solicitation was false and misleading because it misrepresented material facts and concealed adverse material facts from Stillwater Funds' investors for the following reasons.

15.     The Business Combination primarily benefited insiders at Stillwater and Gerova.

16.     The Consent Solicitation did disclose that Gerova would pay the Stillwater Defendants a fee of 2% of the Stillwater Funds' net asset value at closing, estimated at $12 million, and 266,666 shares of Gerova stock worth an estimated $2.0 million, presumably for recommending that Stillwater investors approve the Share Exchange.

17.     Stillwater also received multi-year contracts to manage the Stillwater Funds' and their assets transferred to Gerova in the Share Exchange.

18.     Defendants failed to disclose in the Consent Solicitation that these new management contracts for Stillwater were substantially better than the existing ones because they reset the net asset value high-water benchmark from which Stillwater's performance fees would be measured.

19.     Thus, the Stillwater Defendants stood to gain a substantially greater performance fee – 20% of net profits – based on the increase in net asset value of the funds from their value as of December 31, 2009 going forward rather than the much higher net asset value benchmarks from which the performance fees were measured previously.  Stillwater would in essence receive a 20% performance fee if they ever recouped the loss of value to date of the Stillwater Funds, when the existing management contracts would not have paid any performance fees unless and until Stillwater

5

had recouped the losses to the funds. This unpleasant fact was concealed from Stillwater investors when Defendants asked them to vote on the Share Exchange.

20.     Defendants also failed to disclose that Gerova's officers and directors secretly owned and controlled Amalphis and Allied Provident. Thus, Gerova was secretly paying substantial consideration –valued at $87,000,000 to Gerova insiders in the Business Combination, for the businesses of Amalphis and Allie Provident that likely were worth far less than the amount Gerova paid. This overpayment meant the Stillwater Funds' investors were receiving a much smaller share of Gerova in the Share Exchange than they should have based on the true relative values of the combined businesses. It also meant that Gerova was a less valuable entity than presented to Stillwater Funds' investors in the Consent Solicitation.

21.     Defendants also concealed from Stillwater Funds' investors the regulatory violations and prior business failures of Gerova's officers and directors. In one case, Gerova secretly permitted an individual, Jason Galanis, who had been barred from serving as an officer and director of a public company for securities fraud violations, to serve as the president of an important Gerova subsidiary with responsibility for managing the vast majority of Gerova's assets.

22.     The Consent Solicitation also omitted to disclose that Stillwater Funds had outstanding requests for more than $110 million of redemptions from Stillwater Funds' investors that remained unsatisfied.

23.     By refusing to redeem these interests prior to entering into the Share Exchange, Stillwater ensured their 2% commission and 1% annual management fee would be based on a higher net asset value, thereby increasing their fees, and increasing the amount of assets available to pay those fees.

24.    Upon the Stillwater Defendants' recommendation as fiduciaries, Class members approved the Share Exchange and exchanged all of their limited partnership interests for shares of Gerova.

25.    The Share Exchange has been a complete disaster for Stillwater Funds' investors.

26.    Gerova has not issued any financial statements or results since its 2009 year-end results – which did not include the assets of the Stillwater, and Weston Funds, Amalphis, Allied Provident and Northstar which were all acquired in January 2010.   Nor have Plaintiffs received accurate information from Stillwater as to the status of their investments.

27.    Stillwater had agreed to complete audits of the Stillwater Funds within 3 months of the Business Combination closing in order to establish final net asset values for the Stillwater Funds, as a basis for the final number of shares that Stillwater Funds' investors would receive in the Share Exchange.   Those audits were delayed for many months.   Finally, some of the audits were completed, but the auditors refused to issue clean audit opinions because Stillwater had failed to apply GAAP (generally accepted auditing principles) in valuing the funds' assets, even though it was required.   In short, Stillwater had been assigning inaccurate values to the assets in the funds.

28.    Under the terms of the Share Exchange, until a clean audit opinion on the Stillwater Funds is issued, the Stillwater Funds' investors cannot receive their Gerova shares.

29.    Defendants have never given to Stillwater Funds' investors their Gerova shares as promised in the Share Exchange.

30.    Plaintiffs' Stillwater investments have been held hostage by Defendants. The value of their investments has declined to a tiny fraction of its former value.

7

31.     According to a complaint filed by Eden Rock Finance Fund, L.P. against Gerova and Stillwater defendants, on or about January 1, 2011, Don Seymour, one of the independent directors of Stillwater Asset Backed Offshore Ltd., confirmed in an email that the independent directors of that Stillwater fund resigned from the fund's board because Stillwater failed to honestly report the details of the Business Combination to Stillwater Funds' investors in the Consent Solicitation and due to serious disagreements with Stillwater over the valuation of the fund's assets.

32.     These independent directors reported Stillwater's wrongful conduct in connection with the Business Combination to the Cayman Islands Monetary Authority.

33.     Since the closing of the Share Exchange, Defendants have engaged in numerous self-dealing transactions that continue to strip any value from Stillwater Funds' investments.

34.     On December 30, 2010, Jack Doueck admitted to Eden Rock principals that he had not performed due diligence on Gerova or its principals and advisors prior to the Share Exchange.

35.     When an analyst at Dalrymple Finance LLC published a report on Defendants self-dealing, breaches of fiduciary duties, and the negative criminal, regulatory and business histories of Gerova's principals, the value of Gerova stock dropped substantially.  Shortly thereafter, all trading of Gerova shares was suspended.

36.     Plaintiffs seek to recover damages caused by Defendants' breaches of fiduciary duty and violations of federal securities laws in connection with the Share Exchange, and also for Defendants' breaches of fiduciary duties, unjust enrichment and breach of contract following the Share Exchange.

## JURISDICTION AND VENUE

8

37.     The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Securities Exchange Act, and under state common law.

38.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), 28 U.S.C. § 1331, and for the state law claims under *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724-25 (1966).

39.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).

40.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES AND SIGNIFICANT NON-PARTIES

41.     Margie Goldberg, Renée Salam Hanan, and Maurice Hanan, as set forth in the accompanying certifications, were investors in various Stillwater Asset-Backed Funds. Pursuant to the Share Exchange, plaintiffs exchanged their Stillwater investments for restricted shares of Gerova Financial Group, as set out in more detail below.

42.     Defendant Gerova purports to engage in the business of providing regulatory capital for companies suddenly facing increased capital requirements pursuant to new legislation. To do this, it purports to hold about $1 Billion in "Level 3" assets purchased from the Stillwater Defendants and the Amalphis Third-Parties. By definition, Level 3 assets are illiquid, as there is no ready market for them, and their valuation cannot be determined using observable measures.

43.     Defendant Stillwater Capital Partners, LLC is the general partner of a partnership that manages (inter alia) the following Stillwater Funds (collectively the "Stillwater Funds").

a)  Stillwater Asset Backed Fund, LP,

b)  Stillwater Asset Backed Fund II, LP, a Delaware Partnership

c)  Stillwater Real Estate Fund, LP, a Delaware Partnership

d)  Stillwater WPB Venture Partners, LP, a Delaware Partnership

e)  Stillwater WPB Venture Partners II, LP, a Delaware Partnership

f)  Stillwater Market Neutral Fund, LP, a Delaware Partnership

g)  Stillwater Market Neutral Fund II, LP, a Delaware Partnership

h)  Stillwater Market Neutral Fund III, a Cayman Islands exempted company

i)  Stillwater Matrix Fund, LP, a Delaware Partnership

j)  Stillwater Loan Opportunities Fund LLC, a Delaware Partnership

k)  Stillwater Loan Opportunities Fund SPC, a Cayman Islands exempted company

l)  Stillwater Asset-Backed Offshore Fund, a Cayman Islands exempted company

m) Stillwater Asset-Backed Fund SPV, A Cayman Islands exempted company

n)  Stillwater Asset-Backed Fund II Onshore SPV, a Cayman Islands exempted company

o)  Stillwater Trade Capital, LLC

p)  A variety of individual loans made on an ad hoc basic, including:

  a.  A mezzanine loan to a property in Palisade in California

  b.  A development loan to a property at 476-478 Broome Street in New York, New York

10

44.     Stillwater and the Stillwater Funds have a business address of 41 Madison Avenue, 29th Floor, New York, NY, 10010.

45.     Net Five Holdings, LLC, is a limited liability corporation organized under the laws of Florida.  On May 26, 2010, Gerova pledged all its real estate assets to Net Five in return for a 49% stake in Net Five.  Other participants in the joint venture were non-parties Planet Five Development Group, LLC, non-party Gregory Laubach ("Laubach"), and Defendant Robert Willison.  Net Five Holdings' operating members, who control its activities, are non-party Paul Rohan, Laubach, and Defendant Willison. Net Five manages Net Five's real estate.

46.     Non-Party Westmoore Capital is a defunct Ponzi scheme against which the SEC obtained a preliminary injunction on September 27, 2010.

47.     Robert Willison is an operating member of Defendant Net Five, which holds Gerova's substantial real estate assets.  Defendant Willison was director of investor relations for Westmoore Capital.

48.      Throughout the class period, Defendant Gary T. Hirst ("Hirst") was President of Gerova Financial and its predecessor in interest, Asia Special Situation Acquisition Group ("ASSAC").

49.      Gerova purchased an 81.5% interest in Amalphis Group, Inc., ("Amalphis") on January 20, 2010 in exchange for Gerova shares.  Since then, Gerova has owned this interest in Amalphis.

50.      Defendant Michael Hlavsa ("Hlavsa") has been Chief Financial Officer of Gerova since December 23, 2009, when it was ASSAC.  Since Gerova currently has no Chief Executive Officer, this makes Defendant Hlavsa its highest ranking officer.  As detailed below, Defendant

11

Hlavsa has already aided Gerova principals in concealing material related party transactions. As detailed below, Defendant Hlavsa is linked to Defendant Galanis through their involvement in causing the public company Fund.com to lose 98% of its value while engaging in concealed self-dealing transactions with Fund.com's principals.

51.     Defendant Christopher Holmes is a Gerova Vice-President.

52.     Defendant Andrew Tse is a Gerova Vice-President.

53.     Defendant Lou Hensley is President and Chief Executive Officer of Gerova Holdings, Ltd.

54.     Defendant Arie Jan Van Roon a/k/a Arne Van Roon is a Director of Gerova. Arie Jan Van Roon is beneficial owner of Equities Media Acquisitions Holding Corp., a private company managed by Defendant Galanis.

55.     Defendant Stuart L. R. Solomons is a Director of Gerova. He is also a former Managing Director of Gerova.

56.     Defendant Jack Doueck is a principal of Defendant Stillwater. Defendant Jack Doueck is also a Director of Gerova.

57.     Defendant Richard Rudy is a principal of Defendant Stillwater.

58.     Together, Defendants Hlavsa, Holmes, Tse, Hensley, Roon, Solomons, and Doueck, are all of the remaining Gerova directors and officers. Thus, of the three remaining directors, Roon, Doueck and Solomons, none are independent. Solomon is a former Gerova Officer, Doueck is a current officer, and Roon is financially beholden to Jason Galanis through Galinis' management of Equities Media Acquisition Corp, an entity owned by Roon. It would be fair to say that there is no independent check at all on Gerova's management.

59.     Defendant Tore Nag was President and Chief Operating Officer of ASSAC at the time of the Business Combination.  At the same time, Defendant Tore Nag was a director of the Rineon Group.  Gerova purchased the Rineon Group's assets without disclosing Defendant Nag's (or Defendant Hlavsa's) positions at the Rineon Group.

60.     Defendant Keith Laslop was ASSAC's secretary at the time of the Business Combination.  At the same time, Defendant Laslop was a director of the Rineon Group.  Gerova purchased the Rineon Group's assets without disclosing Defendant Laslop's (or Defendant Hlavsa's) positions at the Rineon Group.  Defendant Laslop is a chartered accountant and Chartered Financial Analyst.

61.     Defendant Jason Galanis was, until recently, President of Gerova Advisors, LLC. Galanis also sat on Gerova's Real Estate Committee with Defendant Bianco, then-Gerova's Acting CEO, and Keith Laslop, then-Gerova's Chief Operations Officer.  In these capacities he orchestrated most of Gerova's significant transactions, including the pledging of all of Gerova's real estate to a Joint Venture in which Gerova only held 49% control, and that was controlled by Defendant Robert Willison, former Director of Investor Relations for a recently-shuttered Ponzi scheme.

62.     Throughout the class period, non-party James Tagliaferri ("Tagliaferri") sat on Gerova's Board of Advisors.

63.     Collectively, the individual defendants referred to above are the Individual Defendants.

64.     During the Class Period, each of the Individual Defendants was privy to non-public information concerning the Company.  Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company.    It is

13

appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that

the false, misleading and incomplete information conveyed in the Company's public filings, press

releases and other publications as alleged herein is the result of collective actions of the narrowly

defined group of defendants identified above.  As officers, directors and controlling persons of a

publicly-held company whose securities were and are registered with the SEC pursuant to the

Exchange Act, and that was traded on the NYSE and governed by the provisions of the federal

securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful

information promptly with respect to the Company's financial condition.  The Individual Defendants

participated in the drafting, preparation, and/or approval of the various public, shareholder, and

investor reports and other communications complained of herein.  The Individual Defendants,

because of their positions of control and authority as officers, directors, agents, and/or controlling

persons of the Company, were able to and did control the content of the various SEC filings, press

releases and other public statements pertaining to the Company

## ALLEGATIONS OF WRONGDOING BY DEFENDANTS

### Defendants Have Frozen Plaintiffs' Investments

65.    For over three years now, Plaintiffs Goldberg and Hanan have sought to withdraw

their investments from Defendant Stillwater. They have been rebuffed at every turn. Stillwater has

not even given them an accounting.  Plaintiff's repeated demands are typical of investors in

Stillwater.

66.    Over a year ago, pursuant to a proxy, defendant Stillwater exchanged plaintiff's

investments – like those of most other investors in Stillwater – for restricted shares in defendant

Gerova. The restriction forbids plaintiffs from selling their Gerova shares. According to the Share

Exchange Agreement, Plaintiffs were to have been able to trade the shares when Gerova completed an audit of Stillwater assets. Stillwater stated that purchasers would be able to sell their shares by June 2010; then, when Defendants breached that promise, by January 2011. Now, Gerova has put off indefinitely the date at which plaintiffs will be able to sell their shares.

### Gerova is Engaging in Ongoing Fraud

67. In the meantime, evidence of fraud at Gerova have caused Gerova's stock price to plummet to 20% of its previous value. Finally, on the 24th of February – *almost a month ago* – the New York Stock Exchange stopped trading in Gerova shares. *Gerova has made no public explanation to its shareholders.*

68. There is every reason to believe that Defendants are even now dissipating the value of Gerova's assets. Individual Defendants have taken every opportunity to line their own pockets with Gerova's assets. Individual Defendants have engaged in related party transactions actively concealed behind shell corporations worth several tens of millions of dollars. Individual defendants have placed all of Gerova's substantial real estate assets in a joint venture – Defendant Net Five, whose transactions need not be disclosed to plaintiffs – one of whose three operating members has apparently skipped town. The Joint Venture has been quietly liquidating its real estate stock.

69. Most tellingly, defendants have concealed – up until now – Defendant Jason Galanis's central role in Gerova. On April 27, 2007, Judge Sweet of the United States District Court for the Southern District of New York entered a final judgment against Defendant Galanis for violations of the federal securities laws. Defendant Galanis had fraudulently made materially false and misleading statements in violation of the securities laws. Worse, Defendant Galanis had forged

a Sarbanes-Oxley Certification.  As a result, Defendant Galanis was prohibited from serving as officers or directors of public companies for five years.

70.    Defendant Galanis, as President of a Gerova subsidiary, made most of the business decisions which dissipated Gerova's assets.  Defendant Galanis pledged Gerova's real estate assets to Defendant Net Five, where his crony Defendant Willison ran them.   Defendant Galanis orchestrated the purchase of assets of dubious value from non-party HM Ruby Fund.

71.    Defendant Galanis was able to accomplish this because he has close financial ties to most, if not all, of Gerova's directors and officers.  Defendant Roon, one of Gerova's two remaining Directors, Director Roon is beneficial owner of Equities Media Acquisition Corp., managed by Defendant Galanis.  Defendant Hlavsa – Gerova's most senior remaining officer -- was Chief Financial Officer of Fund.com, a company that he, several other defendants, and Defendant Galanis ran into the ground.  Defendant Willison was director of investor relations for a Ponzi scheme recently shut down by the Securities and Exchange Commission ("SEC") that was run by Defendant Galanis.

72.    As set out in more detail below, Gerova has purchased tens of millions of dollars' worth of assets from related parties.  Operating through corporate shells, Gerova has funneled money to Gerova insiders.  Gerova's Joint Venture Net Five has quietly liquidated its real estate holdings.

## Defendants' Concealed Jason Galanis' Encounters with the Law
## and His Role at Gerova

73.    Defendant Jason Galanis needs no introduction to the legal system.  His father John Peter Galanis was convicted of white-collar fraud – a Ponzi scheme that cost investors about $400

Million – and sentenced to 27 years in prison. John Peter Galanis escaped in 2001 while on a work release program, and has not been apprehended. Defendant Galanis's brother Derek Galanis was convicted of helping to run a large ring manufacturing and distributing the date-rape drug Ecstasy. Then-United States Attorney Todd Robinson argued that Derek Galanis had ties to Kosovo warlords, and may have attempted to develop ties with the Gambino mob family. Defendant Jason Galanis was also charged, but charges against him were dropped.

74.     Defendant Galanis, however, was charged with civil fraud by the SEC in 2005. The SEC complaint alleged that Galanis, as an officer of Penthouse International, Inc., had willfully disregarded a certified public accountant's opinion that revenue from a sale should be amortized over the course of performance. The certified public accountant later consulted with the company's outside auditor, and informed Galanis that the outside auditor agreed with the certified public accountant. Galanis then asked the certified public accountant to draft two versions of the financial statement – one with amortization and one without – telling the accountant he would present them to the outside auditor for review. Galanis then took the version without amortization, *forged the CEO's Sarbannes-Oxley electronic certification*, and issued it.

75.     On this basis, on April 27, 2007, Judge Sweet of the United States District Court for the Southern District of New York enjoined Galanis from being an officer of a public company for five years.

76.     Recently, Jason Galanis has made a return of sorts. He is the subject of a twelve-part expose from retired Forbes editor Robert Flaherty. Mr. Flaherty dubs Defendant Galanis "The Invisible Man" because the companies he runs (into the ground) never disclose his existence. That is precisely the case here.

17

77.     Several federal lawsuits have recently been filed alleging that Defendant Galanis misappropriated funds on a more personal basis.  Thus, in *Szulik v. TAG Virgin Islands, Inc.*, 5:10-cv-00585 (D. N. Carolina), Plaintiff Szulik alleges that Defendant James Tagliaferri defrauded him and transferred the proceeds to (*inter alia*) companies run by Jason Galanis and his brother Jared.

78.     Knowing that it could not publicly disclose Jason Galanis's involvement as a senior executive, Gerova made him President of one of its subsidiaries, Gerova Advisors LLC, and placed him on a key committee, Gerova's Real Estate Committee.  From these positions, with financial control over many of Gerova's directors and officers, Defendant Galanis ran Gerova.

### Plaintiffs invest in Stillwater

79.     Plaintiff Goldberg invested $300,000 in the Stillwater Limited Partner Funds in 2006. A few months later, she sought to redeem her investment, but was told she had missed a cut-off. She has sought redemption of her investment ever since, and has received only token redemptions, notwithstanding provisions in her partnership agreement permitting her to withdraw funds upon sixty days' written notice.  Because the Stillwater Defendants refused to redeem her investment when requested, she consented to the Gerova combination in the hope that it would provide her the promised liquidity.

80.     Plaintiffs Maurice Hanan and Renee Hanan, husband and wife, invested $100,000 in the Stillwater Limited Partner Funds on July 24, 2006, and $2,000,000 on June 21, 2007.  Beginning in the summer of 2008, they repeatedly communicated to Stillwater that they wished to redeem their investments.  Although their efforts have met with partial success -- they received a partial redemption of $510,982.82 – they have been unable to withdraw any more of their investment. Plaintiff Maurice Hanan is 77 years old.  His wife Renee Hanan is 65 years old.  Plaintiff Renee

18

Hanan would like to retire but cannot.  When they sold their house, the Hanan Plaintiffs bought another dilapidated house with the intention of renovating it.  They have been unable to secure enough moneys to do so.  Thus, the house is unoccupied.  Having been prevented from redeeming any more of his Stillwater investments, they consented to the Gerova Share Exchange.

81.    Plaintiffs' experiences in having Stillwater refuse to redeem their valid requests for redemption is typical of many Class Members since the market downturn began in 2007.  Rather than redeem their investments when requested, Stillwater orchestrated the Share Exchange that locked up Plaintiffs' investments for an unknown period of years and caused their investments to incur severe losses.

82.    Defendant Stillwater purports to participate in several investment businesses through the Stillwater Limited Partner Funds.  The Stillwater lines of business include:  (i) loans secured by residential and commercial properties, (ii) financing legal claims, (iii) medical receivables, (iv) commercial accounts receivable, (vii) ownership of participations in loans and loan portfolios.  In addition, Defendant Stillwater occasionally invests in stand-alone projects that are separate from the Stillwater Limited Partner Funds.

83.    The exact amount of funds under management by the Stillwater Defendants at the time of the Gerova combination is uncertain due to Defendants' unwillingness to perform an audit to assess value, but based on Defendants assertions, is believed to be valued at between $500 and $650 million.

### The Gerova Business Combination and Share Exchange

84.    On December 23, 2009, by use of registered mail, the Stillwater Defendants issued to plaintiffs and the class a Consent Solicitation Letter (also known as a "proxy").  The Consent

Solicitation Letter solicited plaintiffs' consent to merge the Stillwater Limited Partner Funds into Asia Special Situation Acquisition Corp. ("ASSAC"), Gerova's predecessor-in-interest. The Consent Solicitation Letter also included a memorandum from ASSAC purporting to describe the Business Combination, and was drafted to induce plaintiffs into voting for the Business Combination.

85. As a result of the Business Combination, plaintiffs and the class were to receive shares of Gerova in exchange for their Stillwater investments. The Gerova shares would be valued at $37.50.[1] The shares would be restricted pending an audit of Stillwater assets, at which point the number of shares each investor would receive would be adjusted to meet the appraised value of Stillwater's assets. Stillwater stated the audit would be complete by March 2010, allowing Plaintiffs to sell their shares by June 2010. When the audit was not complete by March 2010, Stillwater stated it would complete it by November 2010, permitting the shares to be unrestricted by January 2011. In November 2010, Stillwater announced that the audit was not yet complete, and Stillwater could not give a completion date. An audit of at least some of the Stillwater Funds was completed by December 2010. However, the auditors refused to give the funds a clean audit opinion because Stillwater did not use GAAP in valuing the assets. Thus, in exchange for their Stillwater partnership interest, plaintiffs have received nothing except a promise that someday Gerova will issue to them some unknown amount of restricted Gerova shares, based on an audit that may never happen. Plaintiffs are trapped.

86. Stillwater, on the other hand, received a 2% commission on the sale of Stillwater Funds to Gerova in the Share Exchange- estimated at $12.0 million. The commission was calculated

---

1 On November 19, 2010, Gerova made a 5-1 reverse split. The pre-split value of Gerova shares was $7.50. The

on the basis of Net Estimated Value, giving the Stillwater Defendants an incentive to overstate values. Since then, Gerova has been collecting a 0.25% commission quarterly on all assets under management, valued at the December 2009 NAV price. This gives Stillwater an incentive not to complete the audit, as such an audit would likely provide a lower valuation for assets under management than the value Stillwater currently uses.

87.    The Consent Solicitation failed to disclose that Stillwater would receive much more favorable performance fees after the Business Combination since the baseline for measuring any profits was to be substantially lowered as a result.

88.    The merger into Gerova was only one transaction contemplated and consummated by the Gerova Business Combination. Gerova also acquired from the Rineon Group, Inc., 81.5% of the ownership interest of the Amalphis Group.   Although this was not disclosed in either Gerova or Stillwater's filings, Gerova's CFO *was also CFO of Rineon* – he was buying from himself with Gerova currency.

89.    A look into the details of the transaction shows the defendants' willingness and capacity to violate the corporate form for personal advantage. Take the interest in Amalphis. On March 27, 2009, Jupiter Resources, Rineon's predecessor in interest, bought the entire outstanding stock of NatProv holdings for $50 million in stock. NatProv's predominant shareholder was Dr. Gary T. Hirst. Rineon then bought from NatProv an 81.5% interest in Amalphis group for $36 Million in cash. Rineon got the $36 Million in cash from Intigy Absolute Return, Ltd. Intigy was controlled by Defendant Hirst.   Thus, the net effect of the transaction was to funnel $36 Million in cash from Intigy, a company controlled by Defendant Hirst, to NatProv, a company owned by

---

5:1 reverse split consolidated every group of five shares into one, meaning that the post-reverse split valuation of

Defendant Hirst. The remainder was sold to Gerova.

90.     None of these self-dealing transactions were disclosed to Stillwater Funds' investors in the Consent Solicitation.

91.     Amalphis's major assets were all Level 3 assets. By definition, Level 3 assets are assets with no ready market and therefore no objectively quantifiable value. The assets were all purchased by Amalphis from Gerova insiders. Thus, Amalphis owned: Codrington Partners, whose president, Darren Rennick, co-founded Hirst Capital Management with Defendant Hirst, Gerova's President and one of its directors; Global Asset Fund, controlled by a firm controlled by Defendant Hirst; and Taurus Global Fund, a fund whose President is defendant Tagliaferri, who sat on ASSAC/Gerova's Board of Advisors. Thus, without disclosing it, Gerova purchased assets with no objective valuation from a party that had itself purchased them from Gerova insiders. Since Gerova did not disclose this, it is highly likely Gerova overpaid.

92.     Thus, through Defendant Hlavsa, Defendant Hirst sold an asset of dubious value and by means of an intermediary "laundered" it onto Gerova's balance sheets. Gerova did not disclose any of these self-dealing transactions to investors in the Consent Solicitation or elsewhere. Moreover, since Gerova insiders actively concealed the transaction behind a layer of shell companies, there is a strong inference Gerova bought the assets intending to conceal the fraud

**The Net Five Transaction**

93.     On May 26, 2010, Gerova pledged all of its real estate assets to Defendant Net Five, in a deal with non-party Planet Five Holdings, LLC ("Planet Five"). In exchange, Gerova received a 49% interest in the Joint Venture. Planet Five was to provide Joint Venture with about $100 Million

---

Gerova shares in the exchange is $37.50.

in real estate assets – but Gerova has not identified for its shareholders any of these assets. This is a momentous deal for a company whose holdings consist largely of real estate assets. Yet Gerova did not announce the deal until it was obligated to on its Form 20-F, filed June 2, 2010.

94.      Had the Stillwater assets remained on Gerova's balance sheet, Gerova would have been required to account for them in its 20-F statement. Since Gerova transferred them on May 26 – a week before its 20-F was filed – it did not report on the state of the assets. Other than attaching the Joint Venture agreement, Gerova has provided shareholders with no document on this transaction – which alienated from Gerova all of its real estate assets, a substantial proportion of its assets. Nor has Gerova provided any information at all on the other members in the Joint Venture, other than to identify Paul Rohan, Gregory Laubach, and Robert Willison by name, and Planet Five as a Florida Limited Liability Company.

95.      Other aspects of the transaction suggest that it is a fraudulent conveyance. Planet Five, which sells commercial and residential real estate and was required to provide the Joint Venture with $100 Million in assets, does not have a working website.

96.      Net Five has three operating members. Operating members are charged with the day-to-day management of Net Five's affairs. The three operating members are non-parties Paul Rohan and Gregory Laubach, and Defendant Robert Willison.

97.      Defendant Willison was recently Director of Investor Relations at Westmoore Capital. On September 27, 2010, the SEC obtained a Preliminary Injunction against Westmoore Capital, charging that it was a Ponzi scheme. In light of recent revelations of fraud at Gerova, an Atlanta area television spoke to Defendant Willison about his contacts with Westmoore Capital and Net Five Holdings. Defendant Willison responded "I'm no Bernie Madoff". A month later, after the

23

NYSE stopped trading in Gerova's stock, the affiliate returned to Defendant Willison's home. He could not be located. His home was empty of furniture, and neighbors said he'd moved.

98.     Meanwhile, Net Five is monetizing its real estate assets at an alarming rate. In Lackawanna County alone, court records show that Net Five has sold a half-dozen properties in the last month to an organization that represents itself as buying distressed real estate wholesale. In January, 2011, Net Five sold a 337,062 square foot hotel for $1.2 Million.

### The Invisible Man

99.     Beginning on October 4, 2009, former Forbes editor and financial reporter Robert Flaherty began running a series on Jason Galanis, dubbing him "The Invisible Man". The series would eventually run to eleven parts. It tracks Defendant Galanis across several companies, which he ran into the ground, and which later issued restatements of their financial statements.

100.    Fund.com is a company that was associated with Defendant Galanis, Defendant Bianco, who was Chairman of the Board, Defendant Hlavsa, who was CFO, and their associates. Defendant Galanis controlled a company that held 28% of Fund.com's stock. In addition, Defendant Galanis allegedly ran operations at the company.

101.    On June 14, 2010, Joseph J. Bianco and Keith Laslop left Fund.com. On August 24, 2010, Fund.com informed FINRA that it could not timely file its financial results, and requested that it be delisted from the OTC. On November 4, 2010, the Company issued a Form 8-K stating that its Form 10-Q for the quarter ending September 30, 2009, its Form 10-K for the year ended December 31, 2010, and its Form 10-Q for the quarter ending March 31, 2010, could no longer be relied upon. An accounting restatement is a drastic remedy that is only available when no other remedy will work.

102.    In those few months, Fund.com lost 98% of its market capitalization (as evidenced by the need for a 120-1 reverse stock split).

### The Revolving Management Door and the

### Host of Board and Management Resignations at Gerova

103.    Because Gerova is a foreign corporation (Bermuda), its financial statements are due on June 30, rather than March 31.  However, its Principal Executive is still required to sign a Sarbanes-Oxley certification attesting to the accuracy of the financial statements.  A knowingly made false filing is actionable and is also a criminal offense.

104.    Weeks before having to sign the certification, and only months after taking the position, Gerova's CEO Marshall Manley resigned. Gerova gave Manley a $4.0 million severance package for his few months of work.  He was replaced by Defendant Galanis' associate Joseph Bianco, who despite having no previous exposure to the company and no experience in the reinsurance industry, became Acting CEO.  In this capacity, Defendant Bianco signed the Sarbanes-Oxley certification.

105.    Defendant Bianco's presence in Gerova was never really explained.  The Company did not issue a Form 6-K to announce his arrival.  Nor did they announce the reason for his employment, or for the resignation of the previous CEO.  The only clue shareholders could have had that Gerova changed its CEO is that Mr. Manley's signature was replaced with Defendant Bianco's.

106.    However, correspondence from Defendant Galanis indicates that he considers Defendant Bianco a "good friend".

107.    Defendant Galanis held many positions in Gerova.  First, Defendant Galanis was President of Gerova Advisors LLC, a Gerova subsidiary which managed its investments.  Second,

25

Defendant Galanis was a member of Gerova's Real Estate committee. Since Gerova's assets consisted substantially of real estate, this was an important position. Its importance is further evidenced by the other members of the committee: Keith Laslop, Gerova's Chief Operating Officer, and Defendant Bianco, Gerova's Acting CEO. Wearing these hats, Defendant Galanis orchestrated the Net Five transaction, which placed most of Gerova's assets beyond the effective control of and out of sight from Gerova's shareholders.

108.    These are only a few of the major management changes. Since late 2009, Gerova has gone through seven actual or announced Principal Executive Officers within the meaning of Sarbannes-Oxley. Geoffrey Holmes ended his tenure in October 2009. Gary T. Hirst was Gerova's Principal Executive Officer until January 20, 2010. Marshall Manley was Principal Executive Officer until some time in June 2010. Bianco was Principal Executive Officer until January 1, 2011. Since then, as Chief Financial Officer, Hlavsa has been Gerova's Principal Executive Officer.

109.    Gerova has promised that first Keith Harris and then Dennis Pelino would become Chief Executive Officer. Neither accepted the job.

110.    On February 10, 2011, the Company's Board of Directors abandoned it en masse. Bianco, Laslop, Bos, and de Waal all resigned from the Board that day. Hirst and Bianco had just resigned from their Executive positions.

111.    At some time during 2010, the directors of Stillwater's Offshore funds resigned because Stillwater had failed to account for its assets properly.

### The Forbes and Dalrymple reports

26

112.    Beginning on January 5, 2011, Forbes's Investor Advocate and Executive began a series of reports on Gerova. The first report charged that Gerova was related both to Defendant Galanis and to alumni of the defunct Westmoore Capital Ponzi scheme.

113.    On January 10, 2011, an entity calling itself Dalrymple Finance LLC published a report on Gerova. The Report expounded on Gerova's connections with Westmoore Capital. On July 8, 2008, ASSAC (Gerova's predecessor in interest), had planned to invest $200 Million in ChinaTel Group, Inc. Matthew Jennings, the President of Westmoore Capital, then held about 20.5% of ChinaTel's stock, and Westmoore Capital was ChinaTel's investment banker. The deal fell through, and shortly thereafter ChinaTel sued Jennings and Westmoore Capital.

114.    In addition, the Dalrymple Report charged Gerova with a variety of concealed related party transactions.

115.    On January 19, 2011, Gerova issued a rebuttal. The rebuttal claimed that the Dalrymple Report was "replete with materially false information and reaches a series of speculative and unsupported conclusions," without identifying out any such pieces of information or speculative and unsupported conclusions. Gerova also indicated that it had engaged Kroll to investigate Mr. Dalrymple. Beyond that, however, the rebuttal's sole claims were that Mr. Dalrymple was a short seller, had a server hosted in Eastern Europe, and was involved in a company that had been fined by FINRA. Gerova did nothing to rebut Dalrymple's claims of self-dealing.

116.    The Securities and Exchange Commission sent Gerova a Wells notice on June 1, 2010 accusing it of committing securities fraud and of aiding and abetting securities fraud, by making material misstatements and omissions regarding the value of the Stillwater Funds' assets. The Company claims the SEC has dropped the matter.

27

117.     On January 25, 2011, Mr. Weinberg of Forbes Magazine issued another update on Gerova. This report quoted an SEC investigation that resulted in the SEC deciding to take no action against Stillwater for representations it made in connection with its Asset-Backed Loan funds. The report alleged that Stillwater made false and misleading representations about the value of its portfolio. Specifically, the report alleged that the SEC investigation had found that Stillwater's 2007 and 2008 monthly statements misleadingly claimed that only 10% of Stillwater's Real Estate portfolio was nonperforming, without disclosing that this was based on an Executive's evaluation, rather than whether borrowers actually performed. In reality, borrowers representing about 40% of Stillwater's assets were either in foreclosure or missing interest payments. The notice further charged that Stillwater falsely claimed that average maturity of loans was 16 months; in reality, it was much longer, as loan durations were extended for delinquent buyers. Finally, the notice further charged that Stillwater "falsely represented that the Funds' performance and/or investments were reviewed by independent third-party auditors on a quarterly and monthly basis."

118.     On February 10, 2011, Gerova announced that it had accepted the resignations of four of its Board members from their various positions. Joseph J. Bianco, Keith Laslop, Arie Bos and Leonard de Waal resigned from the Board of Directors. In addition, Hirst resigned as Chairman and President and Joseph J. Bianco resigned as acting CEO. Gerova, however, indicated that Dennis L. Pelino had agreed to become Gerova's CEO. On February 15, 2011, Gerova announced that Mr. Pelino had withdrawn his name from consideration for the position of its CEO.

### The Failed Acquisitions of Seymour Pierce and Ticonderoga Securities

119.     On Sunday, February 20, the British Investment Bank Seymour Pierce backed out of a previously announced merger with Gerova. Gerova also announced the acquisition of Ticonderoga

Securities. This acquisition was also soon thereafter terminated presumably because of the negative disclosures of self-dealing and mismanagement at Gerova.

### Gerova's Share Price has Dropped as a Result of Defendants Misconduct

120.    Because of Gerova's and Stillwater's misconduct, Gerova's share price has tumbled from a $30.09 opening on January 3, 2010, to a $5.28 close on February 24, 2010, when trading was halted – a decline of over 80%. The Stillwater Investors were unable to sell their shares throughout the period. The Stillwater Investors are to receive as consideration Gerova shares valued at $30.00/share, for a loss of about 80%, taking Gerova's value as of the last day it was traded.

### The Trading Halt

121.    On February 24, the NYSE halted trading in Gerova. The announcement stated:

> In view of recent events at and public disclosures by the Company, NYSE Regulation is evaluating both the need for further disclosure, as well as the overall suitability for continued listing of the Company's securities. In this regard, NYSE Regulation has requested additional information from the Company which is necessary for such assessment.

122.    Beyond a terse press release that reiterated that the NYSE had halted trading, Gerova gave no reassurances and issued no clarifications to its shareholders.

123.    Gerova is engaged in three federal lawsuits involving its inability or unwillingness to pay its contractual obligations. In *Katten Muchin Rosenman LLP v. Gerova Financial Group, Ltd.*, 11-CV-0867 (S.D.N.Y.), the law firm Katten Muchin Rosenman seeks to recover unpaid legal fees that arose out of the Gerova business combination and have been invoiced since January 2010.

124.    In *Marseilles Capital LLC v. Gerova Financial Group, Ltd.*, 9:10-cv-81294 JIC, beneficial owner Marshall Manley (Gerova's former CEO) sought to recover payments which he alleges are due and owing. Interestingly, as an affirmative defense, Gerova argued that Mr. Manley

had not disclosed that he was CEO of two banks in receivership when he was hired to be Gerova's CEO, and that these positions disqualified him to be Gerova's CEO. Needless to say, Gerova never disclosed this to its shareholders.

125.    In *Hintz v. Gerova Financial Group*, 1:11-cv-00265-JOF (N.D. Ga.), plaintiffs alleged in a verified complaint that Gerova and its subsidiary Defendant Net Five failed to pay them pursuant to what they alleged was a valid contract. According to the complaint, "Defendant [Robert] Willison represented to Plaintiffs that he had full authority to bind Gerova Financial, Net Five Holdings and Planet Five Development (and their subsidiaries)." The verified complaint also alleged:

> The Defendants [including Bianco, Hirst, Galanis, and Willison of
> this action] in this action are all interrelated. The various corporate
> entities are mere conduits for the individual Defendants. The various
> entities do not follow proper corporate formalities, there is an
> absence of timely SEC and state filings, the Defendants intermingle
> assets of the entities and individuals, the Defendants manipulate the
> assets and liabilities of the entities, officers and directors are uniform,
> and the Defendants siphon funds through the various levels of
> corporate shells.

126.    Now, it seems, these defendants who allegedly siphon funds through corporate shells are selling off Net Five's Real Estate assets. Plaintiffs are at their mercy.

## ADDITIONAL FACTS PROBATIVE OF SCIENTER

127.    Defendant Doueck, along with the Stillwater Defendants, has been named in a lawsuit alleging that he failed to repay an investor who opted for repayment rather than exchange of her Stillwater Investment for Gerova shares.

128.    Defendant Tagliaferri, who sits on Gerova's Advisory Board, has been named in a lawsuit alleging that he defrauded an investor out of some $60 Million.

129.    Defendant Hlavsa was also CEO of SunCruz from 2001 to 2004. In 2006, disgraced lobbyist Jack Abramoff pleaded guilty to forging a conspiracy and wire fraud stemming from his 2000 purchase of SunCruz. Abramoff pleaded guilty to concocting a false $23 million wire transfer that made it appear as if he and a business partner contributed a sizable stake of their own cash into the $147.5 million purchase of SunCruz Casinos.

130.    Several of the named defendants – for instance, Defendants Hlavsa and Laslop – are accountants. As accountants, they must have been aware of the need to disclose related party transactions. These Defendants were aware of the related party transactions – they were either officers or directors of both ASSAC/Gerova and the entity with which it engaged in related party transactions. Yet these Defendants actively concealed, rather than disclosed, the transactions.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

131.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who received or were promised the common stock of Gerova in exchange for their Stillwater Investments and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

31

132.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class.  Members of the Class may be identified from records maintained by Gerova or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

133.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

134.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

135.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)   Whether defendants were fiduciaries to the class;

c)   Whether defendants breached their fiduciary duties;

d)   Whether defendants aided and abetted the breach of fiduciary duties;

e)   Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Gerova; and

    f)   To what extent the members of the Class have sustained damages and the proper measure of damages.

136.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violation of Section 14(a) of the 1934 Securities and Exchange Act

### Against Defendants Stillwater, Jack Doueck, Richard Rudy, Gerova, Michael Hlavsa, Gary T. Hirst, Jack Doueck, Tore Nag, Keith Laslop, and Arie Jan Van Roon

137.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

138.   Defendants solicited Plaintiffs' consent to merge into or have their assets purchased by Gerova by means of the Consent Solicitation.

139.   The Consent Solicitation was in respect of a security registered pursuant to §12 of the Exchange Act, in that plaintiffs' were promised and expected to receive registered stock of Gerova Financial Group in the Share Exchange.

140.   The Consent Solicitation was materially false in that it omitted material related party transactions as described above, including the performance fees to Stillwater and the self-dealing by Gerova insiders, and the negative criminal, regulatory and business history of Gerova management.

141.   The Consent Solicitation included a memorandum drafted by Gerova.

33

142.    The memorandum was written for the purpose of enticing the Stillwater Limited Partners to merge with or sell their assets to Gerova.

143.    The memorandum also did not mention material related party transactions.

144.    Gerova, as it provided information about its business to the Stillwater Funds' investors to entice them to agree to the Business Combination, owed Plaintiffs a duty not to make materially misleading statements.

145.    Both Stillwater and Gerova breached their duty.

146.    Plaintiffs relied on Defendants' false and misleading Consent Solicitation.

147.    Plaintiffs have been damaged thereby.

148.    This action was filed within one year of discovery of the violation and within three years of each plaintiff's purchases of securities in the Share Exchange giving rise to the cause of action.

## SECOND CLAIM

### Violation of Section 20(a) of
### Against Defendants Jack Doueck, Richard Rudy, Gerova, Michael Hlavsa, Gary T. Hirst,

### Jack Doueck, Tore Nag, Keith Laslop, and Arie Jan Van Roon

149.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

150.    The Individual Defendants acted as controlling persons of Gerova, ASSAC, or Stillwater, within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, or disseminated to

34

plaintiffs by ways other than by filing with the SEC, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

151.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

152.   As set forth above, Gerova, Stillwater, and the Individual Defendants each violated Section 14(a) by their acts and omissions as alleged in this Complaint.

153.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with the Business Combination.

154.   This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's acquisitions of securities giving rise to the cause of action.

### THIRD CLAIM

**Breach of Fiduciary Duty of Care**

35

**Against Defendants Stillwater, Richard Rudy and Jack Doueck**

155.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

156.    Stillwater and Jack Doueck were fiduciaries of plaintiffs.

157.    By virtue of their fiduciary positions or their acts, Defendants owed plaintiffs a duty of care.

158.    Stillwater as a General Partner and investment manager of the Stillwater Funds, and Jack Doueck as a partner of Stillwater, breached their duty of care by entering into the Share Exchange and recommending Stillwater Funds' investors vote yes for the Share Exchange without doing any due diligence on Gerova, its officers, directors and management.  Doueck admitted this. Defendants also failed to obtain and consider the true value of the Amalphis assets and perform due diligence on Amalphis. Had they done any investigation, they would have learned of the extensive self-dealing, negative criminal, regulatory and adverse business history of the persons connected to Gerova.

159.    As a result of their breach of duty of care, the Stillwater Funds entered into the Share Exchange causing the Stillwater Funds' investors damage because Gerova defendants had engaged in self-dealing transactions, and Gerova was not managed by trustworthy, reliable managers and under whose control the Stillwater Funds would be placed.

## FOURTH CLAIM

### Breach of Fiduciary Duty of Loyalty

**Against Defendants Stillwater, Jack Doueck, and Richard Rudy**

36

160.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

161.    As General Partners, the Stillwater Defendants owed the Stillwater Funds a fiduciary duty of loyalty.  In turn, the Stillwater Defendants owed Plaintiffs a fiduciary duty of loyalty.

162.    The Stillwater Defendants breached this duty of loyalty duty they owed plaintiffs when they fraudulently induced the Stillwater Funds' investors to exchange their investments for shares in Gerova, a transaction in which the Stillwater Defendants had disclosed and undisclosed material interests, specifically the materially greater performance fee earned by Stillwater as a result of the Share Exchange.

163.    This breach caused Plaintiffs' injuries, in that plaintiffs are now left with near-worthless Gerova stock which they have been unable to sell for over a year.

**FIFTH CLAIM**

**Breach of Duty of Candor**

**<u>Against the Stillwater Defendants</u>**

164.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

165.    The Stillwater Defendants owed Plaintiffs a duty of candor to provide accurate and complete information in the Consent Solicitation when seeking investors consents for the Share Exchange and Business Combination.

166.    The Stillwater Defendants breached their duty of candor by providing a false and misleading Consent Solicitation to Plaintiffs.

167.    The Consent Solicitation was issued to Plaintiffs to obtain their consent to enter into the Share Exchange and Business Combination.

168.    As a result of the Stillwater Defendants' breach, Plaintiffs have entered into the Share Exchange and have suffered damage.

**SIXTH CLAIM**

**Aiding and Abetting Breaches of Fiduciary Duties**

**Against Defendants Stillwater, Jack Doueck, Richard Rudy, Gerova, Michael Hlavsa, Gary T. Hirst, Jack Doueck, Tore Nag, Keith Laslop, and Arie Jan Van Roon**

169.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170.    Defendants Stillwater, Rudy, and Doueck owed plaintiffs fiduciary duties of loyalty, care, and candor, and breached them.  Defendants Gerova, Michael Hlavsa, Gary T. Hirst, Jack Doueck, Rudy, Tore Nag, Keith Laslop, and Arie Jan Van Roon drafted and provided a memorandum as part of the Consent Solicitation to plaintiffs purporting to describe the Business Combination.

171.    Defendants also negotiated and structured the Share Exchange to further the Stillwater Defendants breaches of fiduciary duties.

172.    Defendants had actual knowledge of one another's breaches of fiduciary duties.  The Stillwater Side Defendants knew that the Gerova Defendants, made false and misleading statements regarding the Business Combination.  The Gerova Defendants knew that the Stillwater Defendants breached their duties of loyalty, candor, and care, that they owed plaintiffs.

38

173.    The Defendants knowingly induced one another to breach. The Gerova Defendants induced the Stillwater Defendants to breach their fiduciary duties.

174.    Plaintiffs' damages resulted.

## SEVENTH CLAIM

### For an Accounting

### Against all Defendants

175.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

176.    Contrary to promises in the Consent Solicitation and following it, contrary to the terms of the various Stillwater Funds' partnership agreements, Stillwater and Gerova have not produced an audit or accounting of the properties the Funds own and/owned.

177.    The Stillwater Defendants and Gerova defendants have been using the Stillwater assets to their own ends, namely, to participate in self-dealing transactions.

178.    A material condition of the Gerova business combination was that defendants perform an accounting of Stillwater's assets.

179.    Such an accounting will permit defendants to assess the number of shares due plaintiffs.

180.    Relying on defendants' promises of an accounting and the consequent liquidity, plaintiffs consented to the Business Combination.

181.    Gerova has twice failed to perform an accounting, pushing back plaintiffs' receipt of Gerova shares first from July 2010, to January 2010, then from January 2011 to an uncertain date, but at the earliest June 2011.

39

182. The failure to perform an accounting has and continues to cause plaintiffs injury, in that their shares of Gerova are categorically illiquid.

183. Defendants breached their duties by engaging in transactions that alienated and dissipated Gerova's assets at less than fair value to Gerova insiders.

184. Gerova has also failed to issue financial statements for the past year.

185. Plaintiffs are entitled to an accounting.

### EIGHTH CLAIM

### Unjust Enrichment / Restitution

### Against Defendants Stillwater, Doueck, and Rudy

186. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

187. Stillwater and its Principals including Defendant Doueck and Rudy were to receive a 2% commission on the sale of Stillwater assets, 266,666 shares of Gerova stock and increased management performance fees.

188. Stillwater Capital Partners and its Principals receive a 0.25% quarterly management fee to manage Stillwater assets.

189. Defendants are receiving fees based on inaccurate asset values. In addition, Defendants engineered the Business Combination to retain their management fees, rather than to benefit Plaintiffs as required.

190. The Business Combination reset the "high-water mark" entitling Defendants Doueck and Stillwater to additional compensation.

40

191.   Specifically, before the Business Combination, Defendants Doueck and Stillwater were required to make good Plaintiffs' substantial losses in Stillwater before Defendants would be entitled to earn 20% of profits made in investing Plaintiffs' accounts.

192.   After the Business Combination, Defendants Doueck and Stillwater need not make good Plaintiffs' losses.  They are entitled to 20% of any profits earned on Plaintiffs' investments valued at the time of the Business Combination.

193.   The retention of these benefits is unjust.

194.   Plaintiffs seek restitution from Stillwater, Rudy and Doueck.

195.   There is no adequate remedy at law.

**NINTH CLAIM**

**Unjust Enrichment**

**<u>Against Defendant Gerova</u>**

196.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

197.   Gerova received all of the Stillwater Funds and/or Stillwater Funds' assets in the Share Exchange without paying any value to Plaintiffs in the Share Exchange.

198.   Gerova's retention of these benefits is unjust.

199.   Plaintiffs seek restitution from Gerova for taking their Stillwater Funds' investments for no consideration.

200.   There is no adequate remedy at law.

**TENTH CLAIM**

**Breach of Contract**

**<u>Against Defendant Gerova</u>**

201.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

202.   Pursuant to a registration rights agreement dated January 20, 2010, Gerova promised to issue, register and distribute to Plaintiffs common stock of Gerova owing to Plaintiffs pursuant to the Share Exchange.

203.   Gerova and Stillwater obtained Plaintiffs' agreement to the Share Exchange and Business Combination by promising that plaintiffs would begin receiving ordinary shares in Gerova on July 31, 2010, at a rate of one sixth of plaintiffs' holdings per month, "automatically".

204.   The promise of Gerova ordinary shares was a material term of the Share Exchange, in that plaintiffs would not have agreed to part with their Stillwater Funds' investments for no consideration at all

205.   As of March, 2011, Plaintiffs have not received any shares of Gerova as promised pursuant to the Share Exchange.

206.   Gerova breached their contract with Stillwater and with Plaintiffs.  Plaintiffs are third-party beneficiaries of the registration rights agreement.

207.   All conditions precedent to this suit have been met.

208.   Defendant Gerova has breached the agreement and failed to perform causing damages to Plaintiffs.

**ELEVENTH CLAIM**

Violation of Fl. Stat. § 726.101 et seq

**Against Defendants Gerova, Stillwater, Hlavsa, Holmes, Tse, Hensley, Roon, Solomons,**

**Bianco, and Doueck**

209.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

210.    Plaintiffs have various claims against the Defendants in this action.

211.    To avoid judgments against Gerova, various defendants alienated Gerova's real estate assets, as well as some of Stillwater's assets, to Defendant Net Five.

212.    The transfer was made (a) with actual intent to hinder, delay, or defraud any creditor of the debtor and (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation.

213.    Defendant Gerova was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction and Defendant Gerova intended to incur, or believed or reasonably should have believed that it would incur, debts beyond his or her ability to pay as they became due.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(c)     Awarding Plaintiff and the Class punitive damages against Defendants, in an amount to be determined at trial;

(d)     Awarding Plaintiff and the Class injunctive relief against Defendants' further self-dealing and dissipation of Gerova's assets;

(e)     Awarding Plaintiff and the Class an accounting;

(f)     Ordering defendants to disgorge all unlawfully obtained profits;

(g)     Awarding plaintiffs restitution against Defendants;

(h)     Appointing a receiver to oversee Gerova and Stillwater and the Stillwater Funds; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 22, 2011

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen, Esq. (LR5733)
Phillip Kim, Esq. (PK9384)
Jonathan Horne, Esq. (JH 7258)
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 34th Floor
New York, NY, 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com

46